THOMAS FLOOD, TREYNOR SAVINGS BANK, Appellee, v. L. F. BOLLMEIER, Defendant, HENRY ANDERSON, Garnishee, Appellant. THOMAS FLOOD, Appellee, v. L. F. BOLLMEIER, Defendant, HENRY ANDERSON, Garnishee, Appellant. TREYNOR SAVINGS BANK, Appellee, v. L. F. BOLLMEIER, Defendant, HENRY ANDERSON, Garnishee, Appellant.

Conveyance by insolvent: FRAUD. Neither inadequacy of consideration
1 alone nor proof simply that a conveyance was made by an insolvent with intent to prefer certain creditors to the exclusion of others will authorize setting the same aside, it must also appear that the vendee participated in the fraud; but a knowledge of such facts by the vendee as would put a reasonably prudent man upon inquiry concerning the transaction will render the sale fraudulent.

Same: INADEQUACY OF CONSIDERATION: BURDEN OF PROOF. Where a
2 conveyance is shown to have been fraudulent on the part of a grantor, and the difference between the value of the property and the price paid is apparent, the conveyance will be held presumptively fraudulent as to the difference, and the burden is then upon the grantee to repel the presumption.

Evidence of attorney: CREDIBILITY. It is competent for an attorney
3 under proper circumstances to testify in behalf of his client; but where he practically coerced his own employment for a substantial remuneration, merely to give material evidence and not as counsel in the case, his conduct was so reprehensible that this testimony should not be given credence unless strongly corroborated.

Fraudulent conveyances: EVIDENCE. In this action to set aside a con-
4 veyance upon the ground of inadequacy of consideration the evidence is held not sufficient to establish the transaction as fraudulent.

*Appeal from Pottawattamie District Court.*—HON. O. D. WHEELER, Judge.

SATURDAY, DECEMBER 13, 1913.

COMBINED action in equity and proceedings in garnishment seeking to hold defendant, Anderson, as purchaser under a conveyance of real estate claimed to be fraudulent as to creditors. From a decree and judgment against the defendant he appeals.—*Reversed.*

*John J. Hess,* and *Reed & Robertson,* for appellant.

*I. N. Flickinger,* and *Clifford Powell,* for appellees.

WITHROW, J.—I. This proceeding is a consolidation of different actions in garnishment with a cause in equity, the purpose of which is to hold the defendant, Anderson, liable as garnishee and as defendant, as a claimed debtor of one Bollmeier, against whom judgment had been entered in favor of T. L. Flood and the Treynor Savings Bank. The claim upon which the alleged liability is made to depend is that Bollmeier, who was at the time the owner of an undivided interest in a section of land in the Texas Panhandle, being indebted to the parties above named, with fraudulent intent to defeat the claims of such creditors, conveyed his interest in the land in question to Anderson for a grossly inadequate consideration, and that Anderson, with knowledge of such indebtedness and of the purpose of the conveyance, took title to the land, and also with an agreement, in parol, that upon sale of same, after deducting the consideration paid to Bollmeier and his commissions, the profits arising from the transaction should be equally divided between the parties. There was a trial in the district court resulting in a decree and judgment against Anderson, as defendant and garnishee for

$1,801.91 in favor of Flood, and for $476.71 in favor of the Treynor Savings Bank.

II. In the spring of 1906, Anderson, who was the agent for an Omaha Land Company, and resided in the village of Bentley, in Pottawattamie county, of this state, organized a land seekers' excursion to Texas, in order to induce prospective purchasers to look at the lands of this company in that state for sale. As a result of this excursion, Bollmeier, one Hamen, and one Meyer entered into a contract to purchase a section of land, each to have a one-third interest therein. It was understood, of course, that the purchase was for the purpose of realizing a profit on a resale of the land. The price agreed to be paid was $12.50 per acre, and in addition, the purchasers assumed the payment of a school tax in favor of the state of $2 per acre, so that the total cost price of the land to them was $14.50 per acre. Anderson got a commission of fifty cents per acre for effecting the sale. In the fall of 1907, Meyer secured a contract of sale of the tract to a Nebraska man at the price of $20 per acre; but this contract was not carried out by the purchaser, and nothing was realized from it, save the forfeiture of a small cash payment, which was divided among the owners. But in order to prepare for carrying out this contract the owners undertook to pay off a purchase-money lien of $3,500. To raise his share of this money, Bollmeier gave his note to the plaintiff bank, with plaintiff Flood as surety; and Flood, having been compelled to take up the note, became the creditor of Bollmeier. Meyer procured Anderson, who is his brother-in-law, to become surety on a note to the plaintiff bank for his share of the lien, and Anderson, having paid this note and another note of Meyer's to the bank for $1,900, on which he was not surety, agreed to take a conveyance from Meyer of his undivided interest in consideration of this indebtedness, which conveyance was executed in October, 1908, in pursuance of a contract made about November 3, 1907. On October 8, 1908, Hamen also executed a deed to Anderson for his one-third interest for a

consideration of $600 in excess of what that interest cost him. In the meantime Anderson had purchased Bollmeier's interest, paying $300 in cash and the balance in notes, which Bollmeier disposed of. The total amount of the consideration to Bollmeier was at the rate of $8 per acre, assuming the school tax of $2 per acre, so that the consideration actually paid Bollmeier in cash and notes was at the rate of $6 per acre. This purchase of Bollmeier's interest was in November, 1907, and it is this transaction which is complained of as having been for an inadequate consideration and fraudulent as against Bollmeier's creditors. Subsequently Anderson, having acquired the interests of all the purchasers in the section of land, conveyed one-half of it to a company in Council Bluffs at an estimated cash value of about $35 per acre, receiving $3,000 in cash and a stock of goods, which was turned in on the trade by the purchaser as of the value of $10,000, the purchaser assuming the payment of the school tax of $2 per acre. Still later he disposed of the stock of goods in exchange for a farm, turning in the stock at the estimated value of $10,000.

III. Assuming that at the time of the transaction between Anderson and Bollmeier the latter was insolvent, and this we think fairly appears from the evidence, and also that his purpose in the sale was to defeat the claims of some of his creditors and give preference to others, these facts alone would not be a sufficient basis upon which to fix liability against the appellant. *Atkinson v. McNider,* 130 Iowa, 281. It must also be shown that the vendee was a participant in the fraudulent purpose. Wait on Fr. Conveyances, 353. While inadequacy of consideration in the sale by an insolvent is a badge of fraud, such fact alone is not sufficient to show that the transaction was wanting in good faith. *Urdangen v. Doner,* 122 Iowa, 536. But if a purchaser has knowledge of such facts or circumstances tending to show fraud upon the part of his vendor as would put a prudent person upon inquiry as to

1. CONVEYANCE BY AN INSOLVENT: fraud.

the purpose of the transaction, the sale is fraudulent. *Red-head v. Pratt*, 72 Iowa, 99; *Gamet v. Simmons*, 103 Iowa, 166.

And when the transaction is shown to have been fraudulent on the part of the grantor, and the difference between the actual value of the property and the price paid is apparent, the conveyance will be presumptively

2. SAME: inade-
quacy of con-
sideration:
burden of
proof.

fraudulent as to the difference, and in such cases the burden of proof will be upon the grantee to repel the presumption of fraud.

*Lyon v. Haddock*, 59 Iowa, 682. The rules above stated are elementary. It is for us now to make application of them to the facts shown by the record in the case, and determine whether they are such as to sustain the holding of the trial court.

IV. The evidence of knowledge by Anderson of a purpose on the part of Bollmeier to cheat his creditors, and especially these plaintiffs, in making the conveyance of the land, depends largely upon the testimony of one Lindt, now deceased, and his stenographer, Emil Schurz. The deed was drawn by Schurz under the direction of Lindt, and it is also claimed by them that the notes which were given as a part of the consideration were prepared by them. Lindt testified that it was then the subject of conversation between the parties, and understood by him, that the purpose of the sale was to defeat the Flood and bank claims. Much of his testimony was of a general nature, consisting largely of conclusions, but with occasional statements showing that Anderson and Bollmeier were driving a trade, each anxious to secure more to his advantage. The testimony of Schurz was substantially the same as that of Lindt. All of it, so far as it related to the purposes of the transaction, is denied by both Bollmeier and Anderson. We find it necessary to give particular attention to the evidence of Lindt, as well as that of Hamen, because of the facts shown by the record as to how it came to be a part of the case.

Lindt was an attorney. He claimed to have represented

Bollmeier at other times, and perhaps in the matters relating
to this transaction. On the day of the trial of the consolidated
actions he first appeared in the present case,
filing a pleading for Bollmeier. He took no
part in the trial of the case, being active only
as a witness. The present action had been pending for a
considerable time, during which, as appears from the evidence,
Lindt, no doubt realizing that his evidence would be im-
portant, seemed to be seeking an advantage which might result
to him from such fact. He reluctantly admitted to counsel
for appellant, during the trial, that he may have said to
him, "You had better pony up," or the other side would get
his testimony, but says that it was in fun. But without re-
luctance he later in the case testified that he had received
$150 from the attorneys representing the other side to appear
in the case and assist them, following which his activity, not
as counsel, but as a witness, commenced, and that payment
of $150 had been made on the day he appeared. To testimony
thus shown to be marketable we can give no credence. Even
though what he testified to were true, the method of its pro-
curement is so abhorrent to every sense of justice, the circum-
stances attending its presentation so offensive to good morals,
and so shocking a disregard of the ethics and shield of right
which should always protect the trial of a suit at law or in
equity against impure or unworthy methods, or motives, that
only the most satisfactory, indeed, compelling, corroboration
could justify a court or jury in giving to it any weight. We
regret the necessity which requires us to so speak. The wit-
ness is dead, and it would ordinarily be not only a proper but
desirable course to pass without comment or criticism that
which he did in life; but the record of his testimony lives,
is before us as a part of the case, requires consideration, may
not be ignored, and we must apply to it the tests necessary
to determine its credibility. There is wanting that necessary
corroboration which gives to it credence, and we, therefore,
must look further into the record for facts upon which to de-

3. EVIDENCE OF
   ATTORNEY:
   credibility.

termine the question of liability. This criticism must also affect the testimony of his clerk, which is otherwise uncorroborated, and expressly denied.

V. The record fails to show by such proof as would justify us in so finding that Anderson knew or was charged with notice of the purpose of Bollmeier; and, unless the consideration paid by him for the land was grossly inadequate, and the purchase made with knowledge of Bollmeier's insolvency, and the facts were such as to put Anderson upon inquiry as a reasonably prudent man, he would not be liable.

4. FRAUDULENT CONVEYANCES: evidence.

The land purchased was situated in Texas. The original purchase was made by Bollmeier and his associates for $14.50 per acre. The evidence shows that of this consideration the vendor received about $9.50 per acre, the balance going to pay commissions. The original sale was in that period prior to the panic of 1907, when investment in raw real estate was rife, and its selling value was limited only by what purchasers could be induced to pay. The prices then obtained, as has since been demonstrated to the sorrow of many investors, could not be taken as representative in all instances of real values, but resulted largely from speculative conditions. The transaction between Bollmeier and Anderson was in November, 1907, at a time when the country was feeling the effects of a business panic, when money was close, values consequently shrinking, and forced sales of property were necessary. Bollmeier had indebtedness he could not meet, he had his interest in the Texas land, and, desiring to dispose of it, approached Anderson, who finally agreed to purchase it at the price of $8 per acre. It appears from the evidence that Anderson also purchased Meyer's interest in the land for $3,074, and the interest of Hamen for the same amount, being considerably in excess of the amount paid to Bollmeier. These purchases were concluded a year after the purchase from Bollmeier, that from Meyer being in pursuance of the contract given to Anderson almost a year previous, to secure him

for an indebtedness of $2,900 owed by Meyer. Both of these purchases were concluded in the fall of 1908, to enable Anderson to use the one-half of the land in a trade for a stock of goods, with a cash consideration also moving to him; it appearing that in that trade the lands were valued at $35 per acre. The evidence shows that this deal was a trade between traders, and trade values were fixed more for the purpose of determining the amount of ''boot'' which should pass. The stock of goods is shown to have been old, much of it out of date, and shelf worn, and was owned by Beno & Co., who culled it for trade. The transaction affords no safe guide as to values, and for such we must look elsewhere. The testimony of witnesses as to the value of the Texas land in 1907 ranged from $6.50 to $20 per acre, but all agreed that at that time there were few, if any, sales at any price. A considerable part of the evidence as to values was given by residents of Iowa, who obtained their knowledge from what had been told them by Texas people. The preponderance of the evidence of those living in the vicinity of the land shows the value to have been low, and in the light of the whole record, and the financial situation at the time, we are satisfied that, while Anderson may have made a good bargain, indicated by the subsequent trades into which the land entered, yet there is not that in the case which shows a grossly inadequate consideration; and with such finding, the claim that as against him the conveyance was fraudulent, is without sufficient support.

The decree of the trial court is—*Reversed.* All the Justices concur.